**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

TIMOTHY R. ROSENCRANTZ,

                    Petitioner,

v.                                                        Case Number: 04-CV-72407

BLAINE LAFLER,

                    Respondent.

_____/

**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Petitioner Timothy R. Rosencrantz is a state inmate currently incarcerated at the

Saginaw Correctional Facility in Freeland, Michigan, pursuant to a conviction for first-

degree criminal sexual conduct.  He filed a *pro se* petition for a writ of habeas corpus

under 28 U.S.C. § 2254.  An evidentiary hearing was conducted on November 7, 2006.[1]

For the following reasons, the court denies the petition.

**I. BACKGROUND**

Petitioner's conviction arises out of the sexual assault of Elaine Lasky.  The

assault occurred sometime during the late evening hours of August 16, 1995 or the

early morning hours of August 17, 1995.

At trial, Elaine Lasky testified that she spent the evening of August 16, 1995, with

her friend Jack Pascoe at the Dort Motel on Dort Highway in the City of Burton,

Genesee County.  At approximately 10:00 or 10:30 p.m., she and Pascoe walked to a

_____

[1]After determining that an evidentiary hearing was necessary, the court appointed
counsel to represent Petitioner.

store to purchase food and alcohol.  After they returned to the room, Lasky immediately

left to retrieve ice.  When she left the room, she saw a friend, "Mike", in the parking lot.

She spoke to him briefly, and told him she wanted to discuss something with him and

asked him to wait while she returned the ice bucket to the room.  She returned the ice

bucket and left the room again at approximately 10:45 p.m.  However, Mike was no

longer in the parking lot.  A black pick-up truck then pulled up alongside her on the road.

The driver, who Lasky identified as Petitioner, was the only occupant of the vehicle.

Lasky testified that she entered the truck intending to "gank" Petitioner.  She explained

that prostitutes "gank" when they take an individual's money and then flee before

performing any sexual act.

Lasky testified that, after she entered the car, she asked Petitioner if he had been

"out partying."  He said, "I will tell you about some of my parties," and pulled a knife out

from between the seats.  Tr., Vol. II. p. 83.  Petitioner also said, "My first party, I slit the

lady's throat from ear to ear."  *Id.* at 85.  Petitioner then demonstrated cutting Lasky

across her throat and down her chest to her abdomen.  Lasky testified that she put up

her arms and sustained slash marks on her arms.

Petitioner then shoved Lasky's face down on his lap and forced her to perform

fellatio on him.  During this time, Petitioner was driving.  Lasky noticed that Petitioner

was wearing a sleeveless, "muscle-type" shirt, and had a tattoo of a car on his chest.

*Id.* at 91.  Petitioner drove around for about ten minutes and then stopped in the

driveway of what appeared to be an unoccupied home on a dead-end street.  Petitioner

ejaculated.  Lasky begged Petitioner to return her to the Dort Motel, which he did.

Lasky estimated that she was returned to the motel approximately forty-five minutes to one hour after she left.  She described herself as hysterical when she returned to the motel room and told Jack Pascoe what had happened.  She drank two bottles of wine very quickly and took an anti-anxiety medication.  She feared calling the police because she was on probation for a retail fraud conviction.  After approximately an hour to an hour and fifteen minutes, she agreed to call the police and she and Jack Pascoe walked to a bar because they did not have a phone in their room.  About twenty minutes later, they arrived at the bar and Pascoe called the police.

During direct examination, the prosecutor asked Petitioner to reveal a tattoo he bore on his chest.  Lasky identified the tattoo as the same tattoo that was on the chest of the man who assaulted her.

Defense counsel cross-examined Lasky extensively regarding time-line differences between her trial testimony and her preliminary examination testimony.  During the preliminary examination, Lasky testified that she left the motel and encountered her assailant at approximately 1:30 a.m., on August 17, 1995, and that she entered Petitioner's vehicle because he forced her to do so at knife-point.  Defense counsel also extensively cross-examined Lasky regarding discrepancies in the physical description she gave of the assailant.

Burton police sergeant William Gooch testified that police received an emergency call from Lasky at 2:01 a.m., on August 17, 1995.  He testified that he arrived at the scene at 2:06 a.m.  Lasky, who was hysterical, told him that a man in a black pick-up truck had forced her into his vehicle and assaulted her.  She informed him that the

3

assault occurred at approximately 1:45 a.m.  Lasky described her assailant as clean

shaven,[2] shirtless, and as having a car tattoo on his chest.

Petitioner presented an alibi defense.  He claimed that he was in Fairview,

Missouri, 822 miles away, at the time of the offense.  Petitioner presented four alibi

witnesses.

Linda Vanderlinden testified that she and her husband, Gary, own a restaurant,

in Fairview, Missouri.  On August 17, 1995, sometime between 10:30 a.m., and noon,

she and her husband met Petitioner and his girlfriend near Petitioner's rented home in

Fairview, Missouri.  Shortly after that, Petitioner and his girlfriend went to the

Vanderlinden's restaurant for ice cream.  Gary Vanderlinden testified that he and his

wife saw Petitioner in Fairview at approximately 11:00 a.m., on August 17, 1995.

Wayne Johnson, Petitioner's landlord, testified that he met with Petitioner in

Fairview at 1:30 or 2:00 p.m., on August 17, 1995.

Finally, Petitioner's girlfriend, Tamra Rene White testified that Petitioner was with

her in Fairview on August 16 and 17,1995.

## II. PROCEDURAL HISTORY

Following a jury trial in Genesee County Circuit Court, Petitioner was convicted of

first-degree criminal sexual conduct and felonious assault.  On July 18, 1996, he was

sentenced as a second habitual offender to 22-½ to 50 years imprisonment for the

---

[2]Testimony was presented at trial to show that, at the time of the assault, Petitioner had a full beard.

4

criminal sexual conduct conviction and three to six years imprisonment for the felonious assault conviction, to be served concurrently.

Petitioner filed an appeal of right in the Michigan Court of Appeals, presenting the following claims:

I.    The cumulative effect of the prosecutor's misconduct demands reversal.

    A.    The prosecutor's numerous, objected to, improper and inflammatory comments and questions throughout this trial denied defendant any chance at a fair trial where he:

        (1) appealed to the jury's sympathy . . .,

        (2) disparaged the defense and denigrated defense counsel,

        (3) expressed his opinion and vouched for the credibility of complainant Elaine Lasky and

        (4) shifted the burden of proof . . . and by putting the burden on the defense to prove she was not truthful.

    B.    The prosecutor failed to identify and list all known *res gestae* witnesses;

    C.    The prosecutor failed to properly investigate evidence as to ownership of the vehicle allegedly used in this incident; and

    D.    The prosecutor also improperly allowed the complaining witness's perjured and highly material testimony to stand uncorrected before the jury.

II.    Appellant was denied the effective assistance of counsel as guaranteed by the federal and state constitutions where trial counsel failed to:

    A.    Move to suppress pretrial identification and exclude or counter prejudicial tattoo evidence;

    B.    Call or move for a continuance so that he could present the remaining alibi witnesses;

    C.      Move *in limine* to exclude Elaine Lasky from testifying regarding alleged similar acts;

    D.      Object to irrelevant, inadmissible and highly prejudicial testimony;

    E.      Move for the listing and production of critical *res gestae* witnesses; and

    F.      Object to the erroneous instructions.

III.    The trial court plainly erred in allowing evidence of an experiment as to travel time as rebuttal to defendant's out-of-state alibi defense.

IV.    The trial court erred in denying surrebuttal to defendant.

V.    Because defendant was forced to scatter the presentation of his alibi defense throughout the prosecution's case-in-chief, the delays in bringing the case to trial denied him due process of law and a speedy trial.

VI.    The trial court plainly erred in failing to instruct that felonious assault was a specific-intent crime.

VII.    Defendant's double-jeopardy rights under the Fifth Amendment and the Michigan Constitution were violated by his convictions for both first-degree criminal sexual conduct and felonious assault.

VIII.    The cumulative effect of the errors justify reversal for a new trial.

IX.    The trial court erred in imposing a sentence and then replacing it with an enhanced sentence an hour later.

The Michigan Court of Appeals affirmed Petitioner's first-degree criminal sexual conduct conviction and sentence, but vacated his felonious assault conviction and sentence because the trial court erred in failing to instruct the jury as to the requisite intent for felonious assault. *People v. Rosencrantz*, No. 197313 (Mich. Ct. App. Aug. 18, 1998).

Petitioner then filed an application for leave to appeal to the Michigan Supreme Court, presenting the same claims raised before the Michigan Court of Appeals, and the following additional claims:

I.     The Court of Appeals made an erroneous conclusion in their decision on review of appellant's case where the prosecutor may not ask the jury to convict the defendant on the basis of the prosecutor's personal knowledge and the prestige of his office rather than on the evidence.

II.    The prosecutor's comments so infected the trial with unfairness as to make defendant's resulting conviction a denial of due process.  The prosecutor's comments concerning a specialized tattoo on defendant in questioning complainant to elicit an answer aligning to that description . . . of prosecuting attorney during trial proceedings amounted to misconduct and prepared complainant's answers.

III.   The complainant made several statements concerning the events prior to and after [the] alleged attack on her by defendant, whom she stated she did not know . . ., and attack was over period of at most an hour.  In testimony before the jury she stated she suffered over a fourteen hour period . . . . Perjury does exist.

The Michigan Supreme Court, in lieu of granting leave to appeal, remanded the case to the Michigan Court of Appeals and directed the Michigan Court of Appeals, while retaining jurisdiction, to remand the case to the trial court for a hearing pursuant to *People v. Ginther*, 390 Mich. 436 (1973), to determine "whether the defendant was denied the effective assistance of trial counsel because of the alleged failure of counsel to call or seek a continuance in order to call potential alibi witnesses."  *People v. Rosencrantz*, No. 113245 (Mich. Nov. 9, 1999).  In all other respects, the Michigan Supreme Court denied leave to appeal.  *Id.*

As directed by the Michigan Supreme Court, the Michigan Court of Appeals remanded the case to the trial court for a *Ginther* hearing.  *People v. Rosencrantz*, No. 197313 (Mich. Ct. App. Jan. 10, 2000).  Petitioner filed a Motion to Expand Scope of

7

Remand in the Michigan Court of Appeals, arguing than an affidavit obtained from Jan Burgess and dated January 27, 2000, established that the victim, Elaine Lasky, testified falsely and that the prosecution knew of the false testimony but failed to correct it.  The Michigan Court of Appeals denied the Motion to Expand Scope of Remand, finding that the appeal was "necessarily limited to the issue remanded by the Supreme Court." *People v. Rosencrantz*, No. 197313 (Mich. Ct. App. Apr. 24, 2000).

The trial court conducted a hearing on October 13, 2000 and November 3, 2000.  On November 22, 2000, the trial court issued an Opinion/Order Denying Petitioner's Claim of Ineffective Assistance of Counsel.  *People v. Rosencrantz*, No. 95-52884 (Genesee County Circuit Court Nov. 22, 2000).

The Michigan Court of Appeals affirmed the trial court's order.  *People v. Rosencrantz*, No. 197313 (Mich. Ct. App. May 25, 2001).

Petitioner filed an application for leave to appeal the Michigan Court of Appeals' May 25, 2001 Order in the Michigan Supreme Court, raising the following claim:

> Complainant's police statement and preliminary examination testimony indicated she was assaulted in Flint at 1:45 to 2:00 a.m. on August 17, 1995.  Alibi witnesses placed defendant in Missouri early on August 17, 1995, proving he could not have committed the crime.  At trial, complainant unexpectedly changed the time to 10:30 to 11:00 p.m. on August 16, 1995, undercutting defendant's alibi.  The Court of Appeals clearly erred in holding that appellant was not denied effective assistance, where trial counsel failed to present, or move for a continuance so that he could present critical additional alibi witnesses to rebut complainant's time-line.

The Michigan Supreme Court denied leave to appeal.  *People v. Rosencrantz*, No. 119741 (Mich. Jan. 15, 2002).  Justices Cavanagh and Kelly would have directed

8

the prosecutor to respond to the allegations that the prosecutor's office knew that the victim gave false testimony. *Id.*

Petitioner then filed a motion for relief from judgment in the trial court, presenting the following claims:

    I.      Does defendant deserve a new trial based on newly discovered evidence.

          A.      Did the trial prosecutor intentionally mislead the jury by deliberately eliciting false testimony.

          B.      Did complainant Elaine Lasky commit perjury.

The trial court denied the motion for relief from judgment. *People v. Rosencrantz*, No. 95-52884 (Genesee County Circuit Court Nov. 27, 2002).

Petitioner filed a delayed application for leave to appeal in the Michigan Court of Appeals, presenting the same claims raised in the motion for relief from judgment and the following additional claim:

Did the trial court abuse its discretion when it denied defendant's motion for relief from judgment?

The Michigan Court of Appeals denied leave to appeal. *People v. Rosencrantz*, No. 245432 (Mich. Ct. App. July 3, 2003).

Petitioner filed an application for leave to appeal in the Michigan Supreme Court, which the court denied. *People v. Rosencrantz*, No. 124370 (Mich. March 19, 2004).

Petitioner then filed the pending petition for a writ of habeas corpus, presenting the following claims:

    I.      The state prosecutor knew or should have known that the trial testimony of the state's star witness, Elaine Lasky, was false about four material points.

II.    Petitioner's trial and appointed appellate counsel were ineffective within the meaning of the Sixth Amendment and said ineffectiveness prejudiced Petitioner.

On November 7, 2006, the court held an evidentiary hearing on Petitioner's claim that the prosecutor knowingly allowed false testimony to go uncorrected. Two witnesses, Elaine Lasky and Jan Burgess, testified at the hearing. The court will discuss relevant portions of their testimony below.

### III. STANDARD

The Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214 ("AEDPA") applies to all habeas petitions filed after the effective date of the act, April 24, 1996. Because Petitioner's application was filed after April 24, 1996, the provisions of the AEDPA, including the amended standard of review, apply to this case.

28 U.S.C. § 2254(d) imposes the following standard of review on federal courts reviewing applications for a writ of habeas corpus:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d). Therefore, federal courts are bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an

10

unreasonable application of clearly established federal law.  *Franklin v. Francis*, 144

F.3d 429 (6th Cir. 1998).  Additionally, this court must presume the correctness of state

court factual determinations.  28 U.S.C. § 2254(e)(1)[3]; *see also Cremeans v. Chapleau*,

62 F.3d 167, 169 (6th Cir. 1995) ("We give complete deference to state court findings

unless they are clearly erroneous.").

The United States Supreme Court has explained the proper application of the

"contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's]
> clearly established precedent if the state court applies a rule that
> contradicts the governing law set forth in our cases. . . .
>
> A state-court decision will also be contrary to this Court's clearly
> established precedent if the state court confronts a set of facts that are
> materially indistinguishable from a decision of this Court and nevertheless
> arrives at a result different from [the Court's] precedent.

*Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

With respect to the "unreasonable application" clause of § 2254(d)(1), the United

States Supreme Court held that a federal court should analyze a claim for habeas

corpus relief under the "unreasonable application" clause when "a state-court decision

unreasonably applies the law of this Court to the facts of a prisoner's case."  *Id.* at 409.

The Court defined "unreasonable application" as follows:

---

[3]      28 U.S.C. § 2254(e)(1) provides, in pertinent part:

In a proceeding instituted by an application for a writ of
habeas corpus by a person in custody pursuant to the
judgment of a State court, a determination of a factual issue
made by a State court shall be presumed to be correct.

[A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . .

[A]n unreasonable application of federal law is different from an incorrect application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.

*Id.* at 410-11.

When "no state court addresses a properly raised federal claim," a federal court is "no longer bound by AEDPA's deferential standard of review and instead review[s] the claim de novo."  *Williams v. Haviland*, 467 F.3d 527, 530 (6th Cir. 2006).

## IV. DISCUSSION

### A.  *Brady* Violation Claim

In his first claim for habeas corpus relief, Petitioner argues that the prosecutor knowingly permitted the victim, Elaine Lasky, to give false testimony.  Petitioner bases his perjured testimony claim, in large part, on an affidavit of Jan Burgess, executed on January 27, 2000.

Petitioner presented a claim that the prosecutor knowingly presented false testimony in his direct appeal to the Michigan Court of Appeals.  At that time, however, Petitioner had not yet obtained the Burgess affidavit.  Nevertheless, he alleged that the prosecutor knowingly allowed to stand uncorrected Lasky's false testimony that she did not discuss her testimony with anyone from the prosecutor's office prior to trial.

12

Petitioner argued that this testimony was inherently incredible.  The Michigan Court of

Appeals denied the claim, holding, in pertinent part:

> [T]here is no evidence that the victim committed perjury or that the
> prosecutor had knowledge of any perjury.  Defendant's claim in this regard
> is without merit. . . . Moreover, the victim's change in testimony presented
> an opportunity for defense counsel to impeach the victim's credibility, and
> defendant has failed to show how he was prejudiced by the change in the
> victim's testimony.

*Rosencrantz*, 1998 WL 1990428, at *2.

After obtaining the Burgess affidavit, Petitioner sought to raise the perjured

testimony claim in light of this newly discovered evidence in the trial court, the Michigan

Court of Appeals and the Michigan Supreme Court.  Petitioner's attempts to raise his

Burgess affidavit-related claims in state court are detailed in the court's 5/17/06

"Opinion and Order Granting Evidentiary Hearing and Appointing Counsel."  In sum,

despite Petitioner's fair presentation of these claims, no Michigan state court addressed

the merits of his Burgess affidavit-related claims.  Thus, this court's review of these

claims is *de novo*.  *See Williams*, 467 F.3d at 530.

"[D]eliberate deception of a court and jurors by the presentation of known false

evidence is incompatible with rudimentary demands of justice."  *Giglio v. United States*,

405 U.S. 150, 153 (1972) (internal quotation omitted). "The same result obtains when

the State, although not soliciting false evidence, allows it to go uncorrected when it

appears."  *Napue v. Illinois*, 360 U.S. 264, 269 (1959).  A conviction obtained by the

knowing use of perjured testimony must be set aside "if 'the false testimony could . . . in

any reasonable likelihood have affected the judgment of the jury . . .'"  *Giglio*, 405 U.S.

at 154 (*quoting Napue*, 360 U.S. at 271); *see also United States v. Agurs*, 427 U.S. 97,

103 (1976).  In order to prove this claim, a petitioner must show that

> (1) the statement was actually false; (2) the statement was material; and
> (3) the prosecution knew it was false.

*Coe v. Bell,* 161 F.3d 320, 343 (6th Cir. 1999).  Petitioner has the burden of proving a

*Brady* violation.  *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir.2000) (citing *Moore v. Illinois*,

408 U.S. 786, 794-95 (1972)).

Petitioner argues that the prosecutor failed to disclose exculpatory evidence or

knowingly presented false testimony on four material points.  First, during her trial

testimony, Lasky denied meeting with the assistant prosecutor or anyone from the

prosecutor's office prior to trial.  Petitioner argues that Lasky, in fact, had at least one

lengthy pre-trial meeting with assistant prosecutor Garner Train and several other

members of the prosecution team.  Petitioner further argues that Lasky's meeting with

assistant prosecutor Train precipitated the following additional false testimony: (1) that

Lasky had a clear memory of the sexual assault and had not been using drugs prior to

the assault; (2) that she was certain Petitioner was the individual who assaulted her;

and (3) that the assault occurred shortly after 10:30 p.m., on August 16, 1995, rather

than shortly after 1:30 a.m., on August 17, 1995, as she had testified at the preliminary

examination.  Petitioner argues that the change in Lasky's testimony regarding the time

the assault occurred is particularly critical because it impacts the value of his alibi

witnesses.

Petitioner states that he discovered that Lasky had testified falsely when he

reviewed the affidavit of Jan Burgess.  In her affidavit, Burgess states that she was

14

employed as the Educational Support Specialist to Project L.E.A.D. of the Genesee County Sheriff's Department from August 1993 through July 1996.  Her job duties included interviewing inmates, assessing their educational/life skills, and formulating educational and rehabilitation plans for inmates enrolled in the program.  She states that she had contact with Lasky in January 1995 and May 1996 (Petitioner was tried in June 1996).  With regard to her May 1996 encounters with Lasky, Burgess stated, in pertinent part:

> May, 1996: Re-interviewed Lasky and re-enrolled her.  She said she was back in jail as a witness.  She said she told the police she had been raped.  She said she gave a description of the man but that she had no idea what he really looked like or the details of what happened because she had been "cracked up."

> May 1996: While working with Lasky in the 3rd floor activity room at approximately noon, a group of 5 or 6 men arrived on the floor.  The activity deputy brought the men into the room and told me they were there to meet with Lasky and that I would have to leave.  After leaving, I asked the deputy what was going on and who these men were.  He pointed out APA Garner Train and someone else from the prosecutor's office.  He said the others were detectives.  This group surrounded Lasky and was often quite loud, although with the room closed, the deputy and I couldn't understand what was being said.  I left and returned twice more that afternoon to continue working with Lasky.  Each time I returned, this group was still with Lasky (for a total time of at least 3-4 hours).

> The next day, I called Lasky out to continue working with her.  She was very agitated and afraid.  She said she had to do what the men wanted or she felt her husband would kill her.  (Note: at some time during Elaine Lasky's incarceration, I tested and interviewed John Lasky, who was serving a one-year sentence.  He told me he would not be in jail that long because his "old lady" was working with the cops and would get him out.)  . . . She said she worked with the police because her husband "made her" and she was so afraid of him she did whatever he told her to do.

Burgess Affidavit, at p. 2.

15

In her trial testimony, Lasky denied meeting with the prosecutor or anyone else prior to trial:

| | |
|---|---|
| Defense counsel: | Did you have an opportunity to discuss your testimony with anybody prior to coming in here today? |
| Elaine Lasky: | No, sir. |
| Defense counsel: | You never talked to anybody? |
| Elaine Lasky: | No, sir. |
| Defense counsel: | You didn't go over – You weren't over to the prosecutor's office a few days ago, being brought in for any interviews? You weren't around for anything like that? |
| Elaine Lasky: | No, sir. |
| Defense counsel: | You didn't talk to anybody about it prior to coming in here today? You weren't in any rooms up on the second floor talking to anybody about it? |
| Elaine Lasky: | No, sir, I was not. |

Tr., vol. II, p. 110.

The court conducted an evidentiary hearing to develop the factual record on Petitioner's claim that the prosecutor knowingly presented false testimony or allowed such testimony to stand uncorrected.  Burgess and Lasky testified at the hearing.

Lasky testified, in pertinent part, that:

- she did not use drugs the day of the assault, but had been drinking;

- she was intoxicated at the time she entered the truck;

- on the day she selected Petitioner's photo from a photo lineup, she was "probably still half drunk" from a night of drinking;

- she was not certain that Petitioner was the person who assaulted her;

16

- she met with the prosecutor Garner Train and several police officers approximately three times prior to trial;

- she did not recall whether she informed the police or prosecutor that she was intoxicated at the time of the assault;

- she informed police that she was not certain Petitioner was the person who assaulted her;

- she had no conversations with the prosecutors or investigators regarding any other cases besides the one in which she was the complainant against Petitioner.

Tr., Evid. Hearing, 11/7/2006, pp. 4-15.

Burgess's testimony at the evidentiary hearing essentially corresponded to the statements in her affidavit. Because Burgess's testimony corresponds to her affidavit, the relevant portions of which are set forth *supra*, the court will summarize only the most salient points. Burgess testified that she observed Garner Train and several other men meet with Lasky in May 1996 for a period she believed to be several hours. After meeting with Lasky the next day and discussing her meeting with Garner Train, Burgess concluded that Lasky felt she needed to cooperate with the prosecutor or she would face retribution from her husband. Burgess's impression of the situation was that Lasky was being frightened or cajoled into testifying falsely. Burgess testified that Lasky told her she was intoxicated at the time of the assault and that she was uncertain as to the identity of her assailant. Burgess recalled that she spoke to her supervisor about the incident. Burgess justified her decision not to discuss her concerns with anyone else by explaining that her function in the jail was a civilian one and that she had always been advised to keep what she discussed with the prisoners confidential. Burgess was the

17

recipient of confessions and a host of other confidences while working for Project LEAD, but she maintained the prisoners' confidentiality.

Both Burgess and Lasky testified that Lasky met with prosecutor Garner Train and other members of the prosecution team prior to trial. The court found their testimony in this regard to be credible. Respondent presented no evidence to rebut that testimony. Thus, the court concludes that the prosecutor met with Lasky prior to trial, and, accordingly, that the prosecutor allowed false testimony to stand uncorrected, when Lasky denied any pre-trial meetings.[4]

The testimony at the evidentiary hearing, however, did not persuade the court that the prosecutor knowingly presented the additional false testimony alleged by Petitioner. First, Petitioner alleges that the prosecutor knowingly presented false testimony that Lasky had a clear memory of the sexual assault and had not been using drugs prior to the assault. Lasky testified at trial that she was sober when she entered

---

[4] In his Supplemental Brief Following November 7, 2006 Evidentiary Hearing, Respondent argues that no *Brady* violation occurred because "[a] review of the record strongly suggests that defense counsel knew about a meeting between Lasky and the prosecutor in 1996 around the time of trial," and there is no *Brady* violation where a defendant knew or should have known the facts permitting him to take advantage of exculpatory information. Brief at p. 3. In support of this argument, Respondent cites the portion of the trial court transcript where defense counsel asks Lasky with whom she met prior to trial. Defense counsel asked Lasky four times whether anyone spoke to her about her testimony prior to trial. Respondent apparently believes that the repetition of the substance of these questions, although each was presented in a different way, and the fact that defense counsel asked whether any meetings occurred on the second floor of the jail, suggest some specific knowledge on the part of defense counsel. The court is not persuaded by this argument. The court concludes that defense counsel's repeated questions, instead, reflected the belief that Lasky's testimony that neither the prosecutor nor any deputies met with her, the key prosecution witness, prior to trial was inherently incredible. In fact, defense counsel argued as much in his appeal to the Michigan Court of Appeals.

the truck and only became intoxicated after the assault when she drank large amounts of wine to calm herself.  At the evidentiary hearing, Lasky testified that she was intoxicated when she entered the truck.  Pascoe testified at trial that Lasky was not intoxicated when she left the motel room to retrieve ice, nor was she intoxicated when she returned to the motel room after the assault.  Petitioner has submitted an affidavit from Pascoe in which he attests that he spoke to the prosecutors and some police officers and is "confident" that he told them that Lasky had been drinking and doing drugs before she left the motel room to retrieve ice.

Petitioner bears the burden of showing that Lasky's testimony that she was not intoxicated at the time of the assault and that she clearly remembered the assault was "indisputibly false." *Byrd v. Collins*, 209 F.3d 486, 517 (6th Cir. 2000).  He has failed to sustain that burden.  At the evidentiary hearing, Lasky did not recall whether she informed officers or the prosecutor that she was intoxicated at the time of the assault. While Jack Pascoe now maintains in his affidavit that he informed the prosecutor and police that Lasky was intoxicated, this does not establish that Lasky's trial testimony was false.  His affidavit, executed eleven years after the assault, does not persuade the court that he did, in fact, inform police or the prosecutor Lasky was intoxicated when she left the hotel room.  *See Williams v. Coyle*, 260 F.3d 684, 708 (6th Cir. 2001) ("[R]ecanting affidavits are always viewed with extreme suspicion.")(internal quotation omitted).

Second, Petitioner alleges that Lasky's testimony that she was certain Petitioner was the person who assaulted her was false and that the prosecutor knew it was false. At trial, Lasky testified that, when shown a photo line-up, she "immediately" identified

19

Petitioner as her assailant.  Tr., Vol. II, p. 107.  At trial, Petitioner was asked to expose a tattoo on his chest.  Lasky identified the tattoo as the same tattoo that was on her assailant's chest.  During the evidentiary hearing, Lasky testified that she informed police prior to trial that she was not certain whether Petitioner was the person who assaulted her.  This testimony, by itself, is insufficient to establish that the prosecutor knowingly presented false testimony when he permitted Lasky to testify that she identified Petitioner.  Once the prosecutor elicited testimony from Lasky identifying Petitioner as her assailant, it fell to defense counsel to explore the certainty of her identification, which he did.  Thus, the court concludes that Petitioner has failed to satisfy his burden of showing that Lasky's testimony identifying Petitioner as her assailant was false or that the prosecutor allowed her to testify with a degree of certainty she did not possess.

Finally, Petitioner alleges that Lasky's testimony that the assault occurred shortly after 10:30 p.m. was false, and that the prosecutor knew it was false.  Petitioner has established the following: between the time of the preliminary examination and the time of trial Lasky's testimony as to when the assault occurred changed.  At the preliminary examination, Lasky testified that the assault occurred sometime after 1:45 a.m., on August 17, 1995; at trial, she testified that the assault occurred shortly after 10:30 p.m., on August 16, 1995.  Aside from establishing a change in her testimony, Petitioner has not shown that the time-line testimony provided at trial was false.  Neither Petitioner nor Respondent questioned Lasky about the change in her time-line testimony during the evidentiary hearing.  The burden to establish that the 10:30 p.m. assault time was incorrect is Petitioner's.  Petitioner has failed to meet that burden.

20

Thus, the court finds that Petitioner has established that the prosecutor knowingly presented false testimony, or permitted it to stand, with respect to only one area of testimony: Lasky's testimony that she did not meet with the prosecutor or police prior to trial.  The court must decide whether the false testimony was "material."  *Coe*, 161 F.3d 343.

In most cases involving a *Brady* violation, evidence is considered material only "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  *Kyles*, 514 U.S. at 433-34, *quoting United States v. Bagley*, 473 U.S. 667, 685 (1985).[5]  In the case of the knowing presentation or use of false testimony however, a standard of materiality more favorable to the defendant applies.  In such cases, false testimony is "material" if "'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'"  *Giglio*, 405 U.S. at 154, *quoting Napue*, 360 U.S. at 271.  If the court finds the testimony material, it must determine whether the error was harmless.[6]

---

[5]This materiality standard is commonly referred to as the "*Bagley* standard."

[6]  A separate harmless-error analysis is not required when addressing a *Brady* claim that does not involve the knowing presentation or use of false testimony.  "The reason is compelling: the *Bagley* materiality standard necessarily requires a court to find an impact on the jury verdict sufficiently substantial to satisfy the *Brecht* harmless error test.  Thus, in the non-perjury setting, all that is required or appropriate is the one-step *Bagley* inquiry into reasonable probability."  *Gilday v. Callahan*, 59 F.3d 257, 268 (1st Cir. 1995).

In contrast, because the materiality standard applicable to perjury-related claims is less demanding than the *Brecht* harmless-error analysis, where a court finds that the less demanding materiality standard has been satisfied, the court must still apply the *Brecht* harmless-error analysis.  *See Carter v. Mitchell*, 443 F.3d 517, 537 (6th Cir. 2006) (applying *Brecht* harmless-error analysis to claimed *Giglio* violation); *Gilday*, 59 F.3d at 268 ("Applying the [*Giglio* standard] in most cases involving perjury or its

21

The more important a witness's testimony is to the prosecution's case, the more likely it will be that the perjured testimony could have affected the jury's decision. *See Giglio,* 405 U.S. at 153-55; *Carter,* 443 F.3d at 537. In the context of a claim that the prosecutor failed to disclose impeachment evidence, the Sixth Circuit Court of Appeals has found the following relevant to materiality: "'where the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material.'" *Byrd v. Collins*, 209 F.3d 486, 518 (6th Cir. 2000), (*quoting United States v. Avellino*, 136 F.3d 247, 257 (2d Cir. 1998)). The Supreme Court has emphasized that the materiality test is not a sufficiency of the evidence test. *Kyles,* 514 U.S. at 434-35. "A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.*

The court is troubled by the prosecutor's conduct in allowing  to stand uncorrected Lasky's incorrect testimony denying that she met with the prosecutor and police officials before trial. Certainly, the prosecutor should have raised the issue with Lasky on re-direct or otherwise endeavored to clarify the record. However, as a long line of prosecutorial misconduct cases makes clear, the "touchstone" of the analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips,* 455 U.S.

equivalent will likely result in a finding of constitutional error. Scaling that lower materiality hurdle, however, will still leave the petitioner facing the *Brecht* harmless error inquiry . . . ").

22

209, 219 (1982).  Without doubt, Lasky's testimony was the key evidence against

Petitioner.  Evidence that Lasky, in fact, met with the prosecutor and police prior to trial

could have provided an additional basis for the defense to question her credibility and

potentially argue that Lasky's testimony, particularly her time-line testimony, was

influenced by her meeting with the prosecution team.  But, the court is not convinced

that there is a "reasonable likelihood" that the perjured testimony could have affected

the judgment of the jury.

Defense counsel had and in fact utilized many other avenues for attacking

Lasky's testimony.  Testimony adduced at trial showed that she was a recovering

alcoholic and drug addict and that the assault was preceded by a two-day relapse

during which she drank alcohol and used cocaine.  Lasky admitted, and Officer Gooch

and Jack Pascoe substantiated, that when she gave her statement to Officer Gooch she

was intoxicated.  Defense counsel explored many inconsistencies between Lasky's trial

testimony and her statement to Officer Gooch and her preliminary examination

testimony.

Petitioner's argument that Lasky's change in time-line testimony essentially

negated his alibi defense is not persuasive.  There were three components to

Petitioner's alibi defense:  (i) the testimony of his girlfriend Tamra Rene White, who

testified that Petitioner was with her in Fairview on August 16 and 17, 1995; (ii) the

testimony of Wayne Johnson, who testified he met with Petitioner in Fairview at 1:30 or

2:00 p.m. on August 17, 1995; and (iii) the testimony of Linda and Gary Vanderlinden,

who testified that they saw Petitioner on the morning of August 17, 1995, in Fairview.

The jury necessarily discounted White's testimony in finding Petitioner guilty, without

23

regard to the change in time-line testimony.  Wayne Johnson's testimony was not significantly impacted by the change in time-line testimony because, even had Lasky testified the assault occurred at 1:45 a.m., Petitioner could conceivably have driven fast, all night, and reached Fairview to meet with Johnson at 1:30 p.m.[7]  Thus, while Petitioner argues that the change in time-line testimony neutralized his alibi defense, it impacted only the Vanderlinden's alibi testimony.

Linda Vanderlinden testified that she and her husband Gary saw Petitioner near one of their rental properties in Fairview, Missouri, on August 17, 1995, sometime between 10:30 a.m. and noon.  Tr., Vol. II, p. 169.  She could not narrow down the time any further than that.  As Ms. Vanderlinden testified, it could have been 10:32 a.m. or 11:58 a.m.  *Id.* at p. 172.  Ms. Vanderlinden's husband, Gary, testified that he and his wife saw Petitioner on August 17, 1995, at approximately, 11:00 a.m.  Tr., Vol. IV, p. 362.

At trial, Lasky testified she left the motel room at approximately 10:45 p.m. Moments later, she entered Petitioner's vehicle.  She estimated that she was in Petitioner's vehicle for about forty-five minutes.  Therefore, according to her trial testimony, the earliest Petitioner left her presence was approximately 11:30 p.m.  If Petitioner immediately thereafter began the drive to Fairview, he could have reached Fairview to be seen by the Vanderlindens at 11:00 a.m., by averaging 66 miles per hour.  If, instead, the assault concluded at approximately 1:45 a.m., as Lasky testified at the preliminary examination, Petitioner would need to average approximately 80 miles

---

[7] This would have required Petitioner to drive 822 miles in approximately 13 hours, an average speed of 63 miles per hour.

per hour to be seen by the Vanderlindens at 11:00 a.m.  Petitioner's argument assumes

two things: first, that the alibi witnesses were truthful and accurate, and second that no

rational jury could accept that he would have been able to commit the crime and drive

80 m.p.h. all night, i.e., that the alibi was very strong, perhaps unassailable.

Correspondingly, Petitioner assumes that a rational jury *could* accept that he would

have been able to commit the crime and drive 66 m.p.h. all night, i.e., that his alibi

would be thereby negated. The court frankly doubts Petitioner's assumptions in this

regard, but more important than a court's impression is that the jurors had available to

them at the time of trial all of the information with which to undertake these calculations,

and to determine if even an earlier time-line, with its 63 or 66 m.p.h. requirement,

provided a rational way to reconcile guilt with truthful, accurate alibi witnesses.

Testimony regarding whether Lasky met with the prosecution team prior to trial did not

impact or prevent the jury from such time calculations[8] or from assessing the credibility

of the alibi witnesses they had heard present their recollection of the events of ten

months earlier.[9]

_____

[8] Additionally, Petitioner had the opportunity to establish at the evidentiary hearing that Lasky's meeting with the prosecutor somehow influenced her change in testimony.  Petitioner, however, did not question Lasky about the substance of her meeting with the prosecution team.  Therefore, the court will not assume that, had Lasky testified at trial that she met with the prosecution team, any testimony about the substance of that meeting would have been favorable to Petitioner.

[9] As noted above, it is inescapable that the jury concluded that Petitioner's girlfriend testified falsely or mistakenly, as her testimony, if accepted, would have made it utterly impossible for Petitioner to have committed the crime. No observer from this distance can know with assurance, but it seems reasonable that the jury simply did not believe the testimony of the other alibi witnesses either, whose testimony, if accepted, would have made it not absolutely, but at least *virtually* impossible for Petitioner to have committed the crime.

25

In addition, the jury had a compelling piece of incriminating evidence to consider: before there had arisen any time-line disputes or discrepancies about talking to the assistant prosecutor before trial, Lasky told the responding police officer that the perpetrator, whoever he was, possessed something immutable, unusual and memorable: the tattoo of a car on his chest. The parties do not dispute that, as of the summer of 1995, Petitioner bore just such a tattoo of a car on his chest. Also, prosecution witness Ellen Rogers connected Petitioner to a vehicle similar to the vehicle described by Lasky. Lasky described the car driven by her assailant to be a 1983 to 1985, black Chevrolet pick-up truck. Ellen Rogers testified that, during the summer of 1995, she was employed as a pool attendant at an apartment complex pool. Rogers was responsible for signing in those who wished to use the pool. In July 1995, an individual with a car tattoo on his chest signed in to use the pool under the last name "Rosencrantz." Rogers testified that this individual drove a dark-colored pick-up truck. At trial, Rogers identified Petitioner as the individual who was at the pool in July and driving the dark-colored pick-up truck.

Considering all of these factors, the court finds that the false testimony about meeting with the assistant prosecutor may have provided additional impeachment material, but that this impeachment material would have been merely cumulative to the other well-explored attacks on Lasky's credibility resulting from her inconsistent testimony and drug and alcohol use.

Moreover, even if Petitioner established a "reasonable likelihood that the perjured testimony could have affected the judgment of the jury," the constitutional error was harmless. *Giglio*, 405 U.S. at 154 (internal quotation omitted). To determine whether a

26

constitutional trial error is harmless, a federal court must decide whether the error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), *quoting Kotteakos v. U.S.*, 328 U.S. 750, 776 (1946). If a federal judge in a habeas proceeding "is in grave doubt about whether a trial error of federal law has substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless. And, the Petitioner must win." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (internal quotation omitted). The harmless error analysis articulated in *Brecht* applies even if a federal habeas court is the first to review for harmless error. *Gilliam v. Mitchell*, 179 F.3d 990, 995 (6th Cir. 1999).

The substance of the case against Petitioner would not have changed had Lasky's false testimony been corrected. Ascribing a motive to Lasky's change in testimony or showing that this portion of her testimony was untruthful would not have made a measurable difference in the defense's ability to challenge her credibility. Lasky's testimony that her assailant had a car tattoo on his chest remained constant from her initial statement to Officer Gooch through her trial testimony. In light of the cumulative nature of the impeachment evidence and the car tattoo testimony, the court is not in grave doubt about whether the false testimony had "substantial and injurious effect or influence in determining the jury's verdict." *O'Neal*, 513 U.S. at 436. Therefore, the court finds any error was harmless.

### B.  Ineffective Assistance of Counsel Claim

27

In his second claim for habeas corpus relief, Petitioner argues that his trial attorney was ineffective in failing to investigate and call certain alibi witnesses and in failing to request a continuance to secure the presence of alibi witnesses.[10]

To establish that he received ineffective assistance of counsel, a petitioner must show, first, that counsel's performance was deficient and, second, that counsel's deficient performance prejudiced the petitioner. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A petitioner may show that counsel's performance was deficient by establishing that counsel's performance was "outside the wide range of professionally competent assistance." *Id.* at 689. This "requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687. To satisfy the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "[T]he focus should be on whether the result of the trial was 'fundamentally unfair or unreliable.'" *Tinsley v. Million*, 399 F.3d 796, 802 (6th Cir. 2005), *quoting Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993).

On remand, the trial court conducted an evidentiary hearing during which Petitioner and his trial attorney, Kim Shaw, testified. Shaw testified regarding the extent of the investigation undertaken to locate alibi witness, his decision to call certain

---

[10] Petitioner alleges in a point heading that his appellate attorney was also ineffective. He fails to provide any argument in support of that claim. The court, therefore, denies Petitioner's ineffective assistance of appellate counsel claim.

28

witnesses and not to call others, and the information Petitioner provided him about

potential alibi witnesses.

Following the evidentiary hearing, the Michigan trial court issued a written opinion

holding that Petitioner failed to satisfy the demanding *Strickland* standard and denying

Petitioner's ineffective assistance of counsel claim. The trial court, the last court to

issue a reasoned opinion on this claim, stated, in pertinent part:

> Defendant's allegation of ineffective assistance of counsel was initially
> stated as the failure to call Chief Gary Sanders, the mayor's wife, Vickie
> Intessimone, Wayne Cox, and an unknown video clerk, or to seek a
> continuance. . . .
>
> At the hearing, Kim Shaw testified to his efforts to present an alibi
> defense. He hired an investigator and sent the investigator to Missouri to
> find "anybody else down there that could possibly have given any
> information that Mr. Rosencrantz was in Missouri, right around the evening
> of the 16th, the morning of the 17th. (GH Tr., p. 36) Shaw and the
> defendant both testified that the investigator met with defendant and
> defendant provided a written list of potential witnesses. . . . The
> investigator interviewed all of the potential alibi witnesses he could locate.
> . . . the investigator was unable to locate some of the witnesses and the
> others now claimed to be alibi witnesses by the defendant were not
> disclosed to counsel prior to trial.
>
> Shaw testified relative to every alleged alibi witness. Some were called as
> witnesses (Tamara White, Linda Vanderlinden, Gary Vanderlinden, Wayne
> Johnson, and Karen Gautz), some counsel made a strategic decision not
> to call (Vicki Intessimone and Chief Gary Sanders), others were never
> located (Wayne Cox . . ., Daniel at the automotive store . . ., and the video
> clerk . . .) and some were unknown to counsel (the mayor's wife).
>
> Chief Gary Sanders, when interviewed by investigator Koontz, had
> provided an alibi for the early morning hours of August 17, 1995. . . . Later
> he recanted his statement. . . .
>
> Both investigator Koontz and Shaw interviewed Vicki Intessimone. Based
> upon these interviews Shaw made a decision not to call her because she
> was a "flake." (GH 61).
>
> The unknown video clerk on August 16, 1995, has never been identified.

. . .

A review of Shaw's investigation and decision regarding each alleged witness demonstrates that he committed no error and his conduct was above an objective standard of reasonableness.

*Rosencrantz*, slip op. at 3-4.

Petitioner also claimed that his attorney was ineffective in failing to call as a witness the mayor's wife to whom he purportedly paid a water bill on August 16, 1995. The trial court found credible defense counsel's testimony that defendant did not tell him to whom he paid the water bill and did not recall obtaining a copy of the water bill. The trial court therefore concluded that counsel was not ineffective in this regard. *Id.* at 5.

Petitioner has failed to show that the trial court's well-reasoned, comprehensive opinion was contrary to or an unreasonable application of Supreme Court precedent. A review of defense counsel's testimony at the evidentiary hearing evinces an attorney who gave significant thoughtful consideration to his trial strategy, vigorously pursued potential alibi witnesses, and decided not to call certain alibi witnesses for valid reasons.

For example, defense counsel testified that he was originally thrilled when Petitioner named Chief of Police Gary Sanders as an alibi witness. He was a bit less enthusiastic when he learned that Sanders had been dismissed as police chief. He decided not to call Sanders after learning that he recanted his alibi testimony and that Sanders had a "strange sexual relationship with Defendant's girlfriend." *Ginther* Hearing transcript at p. 67. He also determined that Vickie Intessimone would not be a good witness because she came across as a "flake" and asked for $500 or $1,000 in

30

exchange for her testimony. Counsel reasoned her testimony would detract from the solid alibi witnesses he planned to present.

In addition, defense counsel's testimony demonstrated that he felt that a continuance based upon Lasky's change in testimony would not have benefitted the defense because he and the investigator had attempted to locate witnesses for August 16 and 17, and had not located any alibi witnesses who would have provided additional favorable testimony once Lasky changed her testimony.

The court finds that the trial court's analysis of counsel's performance constitutes a proper application of the *Strickland* standard of review. There is no basis for concluding that Petitioner is entitled to habeas relief on this claim.

## V. CONCLUSION

The court finds that the prosecutor allowed Elaine Lasky's false testimony that she did not meet with the prosecution team prior to trial to stand uncorrected, but finds that the testimony was not material. Moreover, even if the testimony were material, the constitutional error was harmless. In addition, the court finds that the state court did not unreasonably apply *Strickland v. Washington*, in determining that trial counsel was not ineffective.

Accordingly, IT IS ORDERED that the petition for a writ of habeas corpus [Dkt. #1] is DENIED.

            s/Robert H. Cleland
           ROBERT H. CLELAND
           UNITED STATES DISTRICT JUDGE

Dated: March 26, 2007

31

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, March 26, 2007, by electronic and/or ordinary mail.

 s/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522

S:\Cleland\JUDGE'S DESK\C3 ORDERS\04-72407.Rosencrantz.DenyHabeas.mbc.3.wpd